UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  07-23005-CIV-MARTINEZ-BROWN**

JEFFREY KEATING, RICH HERSH, BONNIE
REDDING, JASON KOTOCH and
RAYMOND DEL PAPA,

      Plaintiffs,

vs.

CITY OF MIAMI, a municipal entity; CITY OF
MIAMI BEACH, a municipal entity; CITY OF
FORT LAUDERDALE, a municipal entity;
BROWARD SHERIFF AL LAMBERTI, in his
official capacity as Sheriff of Broward County;
Miami Police Department Chief JOHN
TIMONEY, in his individual capacity; Miami
Police Department Deputy Chief FRANK
FERNANDEZ, in his individual capacity;
Miami Police Department Major ADAM
BURDEN, in his individual capacity; Miami
Police Department Captain THOMAS
CANNON, in his individual capacity; Miami
Beach Police Department Lieutenant ED YERO,
in his individual capacity; Broward Sheriff's
Office Captain JOHN BROOKS, in his
individual capacity; Fort Lauderdale Police
Department Captain LEE SPECTOR, in his
individual capacity,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS

THIS CAUSE came before the Court upon City of Miami's & Miami Police Supervisors'

Motion to Dismiss Amended Complaint (D.E. No. 68), Defendants Lee Spector and City of Fort

Lauderdale's Motion to Dismiss Counts Six, Seven, Eight, Fourteen, Fifteen, Sixteen, Seventeen,

Twenty-One, Twenty-Two, Twenty-Three, and Twenty-Seven of Plaintiffs' First Amended

Complaint (D.E. No. 69), The City of Miami Beach's Motion to Dismiss Counts Six, Seven,

Eight, Twenty-Four, Twenty-Five, and Twenty-Six of Plaintiffs' First Amended Complaint (D.E.

No. 70), Defendant Ed Yero's Motion to Dismiss the Amended Complaint (D.E. No. 71), and

Defendants Broward Sheriff Alfred Lamberti and John Brooks' Motion to Dismiss the First

Amended Complaint (D.E. No. 72).  Plaintiffs Jeffrey Keating, Rich Hersh, Bonnie Redding,

Jason Kotoch, and Raymond Del Papa (collectively "Plaintiffs") have filed suit against

Defendants the City of Miami, the City of Miami Beach, the City of Ft. Lauderdale, Broward

County Sheriff Al Lamberti in his official capacity  ("BSO"),[1] Miami Police Department Chief

John Timoney in his individual capacity ("Timoney"), Miami Police Department Deputy Chief

Frank Fernandez in his individual capacity ("Fernandez"), Miami Police Department Major

Adam Burden in his individual capacity ("Burden"), Miami Police Department Captain Thomas

Cannon in his individual capacity ("Cannon"), Miami Beach Police Department Lieutenant Ed

Yero in his individual capacity ("Yero"), Broward Sheriff's Office Captain John Brooks in his

individual capacity ("Brooks"), and Ft. Lauderdale Police Department Lee Spector in his

individual capacity ("Spector"), alleging violations of 42 U.S.C. § 1983 and state law claims for

battery and negligence.  All Defendants now move to dismiss the claims asserted against them

pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief

can be granted.  After careful consideration and after hearing oral argument on these motions at a

hearing held on January 12, 2009, the Court grants in part and denies in part Defendants' motions

---

[1] "BSO" is an abbreviation for the Broward County Sheriff's Office.  As this suit has been filed against
Broward County Sheriff Al Lamberti in his official capacity, it is actually a suit against the Broward County Sheriff's
Office.

to dismiss.

## I.  Relevant Factual and Procedural Background

Plaintiffs' civil action arises from events surrounding the Free Trade Area of America's ("FTAA") ministerial meetings held in Miami, Florida in November 2003.  Plaintiffs allege that Defendants' actions to limit the demonstration held outside the FTAA meetings in downtown Miami resulted in violations of Plaintiffs' constitutional rights and state tort law violations.

### A.      Joint Operational Security Plan

Plaintiffs allege that in preparation for the anticipated FTAA demonstrations, numerous governmental agencies created, ratified, and were bound by a Joint Operational Security Plan.[2] As a part of this plan, Defendants agreed "to 'submit to a single plan and a single command,' with defendants City of Miami and Timoney in a 'primary leadership role.'"  (D.E. No. 45, First Amended Complaint at ¶ 29).  The Municipal Defendants[3] also executed Mutual Aid Agreements in connection with the preparation for the FTAA meetings.  *Id*. at ¶ 24.

As a part of the Joint Operational Security Plan, Rules of Engagement were adopted that each agency was required to follow.  *Id*.  These Rules of Engagement included authorization for the use of "so called 'less lethal' munitions, including bean bag projectiles, 'pepper-spray' projectiles, batons, tasers, chemical weapons, and/or other uses of force against Plaintiffs."  *Id*. at

---

[2]In addition, on November 13, 2003, a few days before the FTAA meetings began, the Miami City Commission also passed City Code Section 54-6.1, entitled "Parade and Assembly Prohibitions."  (D.E. No. 45, First Amended Complaint at ¶ 38).  This ordinance "criminalized the possession, by any person gathered in a group of more than eight persons at a public place for a common purpose for more than 30 minutes, of a variety of objects, including *inter alia*, glass bottles, household items, and pieces of metal or plastic outside certain size restrictions." *Id*.  Plaintiffs allege that this ordinance was passed specifically for purposes of policing the FTAA demonstrations. *Id*. at ¶ 39.

[3]When the Court uses the term "Municipal Defendants" it refers to Defendants the City of Miami, the City of Miami Beach, the City of Ft. Lauderdale, and the BSO.

-3-

¶ 26.  Plaintiffs also allege that the Rules of Engagement "improperly allowed use of excessive physical force against individuals involved in passive, non-violent conduct." *Id*. at ¶ 36. Plaintiffs allege that the City of Miami, the City of Miami Beach, the City of Ft. Lauderdale and the BSO all adopted these Rules of Engagement.  *Id*.

   In addition, Plaintiffs allege that " [a] specific, although unwritten, part of the [Joint Operational Security Plan] . . . was the use of excessive force and/or preemptive arrests based on political and ideological profiling, without any individualized probable cause to believe that criminal conduct had already occurred or that such conduct was imminent." *Id*. at ¶ 32.  They also allege that part of the plan was the wrongful "herding" of peaceful protesters with the intention to disrupt "core political speech and other First Amendment-protected expressive activity."  *Id*. at ¶¶ 1, 32.

   The command structure of this Joint Operational Security Plan was comprised of the Miami Police Department Steering Committee and the Joint Law Enforcement Command ("JLEC").  The JLEC "consisted of the heads of the agencies, or their delegated representatives, who were assigned 'a major role or specific function for the security of the FTAA . . . [meetings].'" *Id*. at ¶ 29.  Plaintiffs allege that each of the agencies that was part of the JLEC was instrumental in devising these policies and that they all ratified and adopted through a final policymaker the policies that were part of the Joint Operational Security Plain. *Id*. at ¶¶ 22-30.

### B.    Implementation of Joint Operational Security Plan on November 20, 2003

   Plaintiffs allege that on November 20, 2003, the American Federation of Labor & Congress of Industrial Organizations ("AFL-CIO") and many other organizations planned lawful demonstrations.  *Id*. at ¶ 42.  Plaintiffs allege that on November 20, 2003, the supervisory officer

Defendants including Timoney, Fernandez, Cannon, Burden, Yero, Spector, and Brooks

implemented the Joint Operational Security Plan to "limit protest by targeting and intimidating

ideological demonstrators."  *Id.*  Plaintiffs specifically allege that

> At various times during the day these supervisory defendants deployed mobile
> police lines to interfere with freedom of association; encircled protestors with
> lines of riot-gear clad officers with weapons drawn; dispersed lawful assemblies;
> unlawfully detained, searched and arrested those opposed to the FTAA without
> individualized probable cause; and used brutal physical force, including a wide
> array of munitions as well as the release of chemical toxins, against peaceful
> demonstrators and members of the news media.

*Id.* at ¶ 42.

Plaintiffs specifically allege that on the afternoon of November 20, 2003, the AFL-CIO

began a march leaving from the Bayfront Park Amphitheater, marching through downtown and

then returning to the amphitheater.[4]  *Id.* at ¶ 45.  After the march ended, demonstrators remained

on Biscayne Boulevard on the grass lawn near the Amphitheater.  *Id.*  Plaintiffs were among the

demonstrators that remained in the grass.

After about ten minutes, a representative of the police informed the demonstrators that

they could remain in the area as long as they remained peaceful; however, almost immediately

after this announcement, Plaintiffs allege that "officers from the Miami Police Department,

Miami Beach Police Department, City of Fort Lauderdale Police Department and [the] BSO

opened fire on the demonstrators with tear gas, pepper-spray, shotgun-based projectiles and other

weapons."  *Id.* at ¶ 46.  Plaintiffs allege that the officers then began marching slowly shoulder-to-

shoulder.  *Id.*  They headed north on Biscayne Boulevard, "continuing to fire pepper-spray,

---

[4]The Bayfront Amphitheater is located just north of the Hotel Intercontinental where the FTAA meetings
were being held.  *Id.* at ¶ 43.

beanbags, and other shotgun-based projectiles, and other weapons at unarmed demonstrators and members of the news media, including Plaintiff Keating" who was shooting video of the demonstrations.  *Id*. at ¶¶ 6, 46. The police line marched north on Biscayne Boulevard until they reached Northeast Third Street where the line pivoted and began forcing the remaining demonstrators and others west on Northeast Third Street.  *Id*. at ¶ 49.

Plaintiffs allege that while this was occurring Defendants Timoney, Fernandez, Burden, Cannon, Yero, Brooks, and Spector were either on or just behind the advancing line of police officers and were acting in their supervisory capacity at all times.  *Id*. at ¶ 47.  Plaintiffs allege that it was Defendant Yero who ordered the Miami Beach police officers to begin discharging tear gas.  *Id*. at ¶ 53.  Plaintiffs also allege that any of these supervisory defendants "could have intervened at any time to prevent the continued violations of the unarmed individuals, including Plaintiffs."  *Id*.

### C.     Plaintiffs' Activities on November 20, 2003

#### 1.      Plaintiff Jeffrey Keating

Plaintiff Jeffrey Keating ("Keating") arrived at the Bayfront Amphitheater around noon to film speeches made by the AFL-CIO union leaders and to film the AFL-CIO march.  *Id*. at ¶ 62. Keating was standing in from of the amphitheater after the march when he noticed the police line begin to advance and to shoot weapons into the crowd.  *Id*. at ¶¶ 62-63.  Keating moved from the amphitheater onto Biscayne Boulevard in an attempt to escape the police line.  *Id*. at ¶ 64.  He became surrounded by police lines on three sides with the only open street being Northeast Third Street.  *Id*. Plaintiffs allege that as Keating began walking down Northeast Third Street, facing the police line he was struck in the face by a projectile.  *Id*. at ¶ 65.

### 2.      Plaintiffs Rich Hersh and Bonnie Redding

Plaintiffs Rich Hersh ("Hersh") and Bonnie Redding ("Redding") attended the

demonstrations as National Lawyers Guild legal observers.  *Id*. at ¶ 66.  They were on Biscayne

Boulevard when the police line formed and began advancing.  *Id*.  Redding was pushing Hersh

who was in a wheelchair.  *Id*.  Redding saw that a demonstrator who had been struck in the head

by police was bleeding, and Redding left Hersh to speak with the demonstrator.  *Id*.  Hersch

moved in his wheelchair to take photographs when police fired tear gas.  *Id*. at ¶ 67.  Hersh began

succumbing to the tear gas, and an unknown woman pushed him out of the area.  *Id*. at ¶ 68.

Redding also felt the affects of the tear gas and ran towards where she had left Hersh, eventually

finding him.  *Id*. at ¶ 69.  Plaintiffs allege that Redding suffered respiratory problems "during and

immediately after the event" and that Hersh has suffered "ongoing respiratory problems."  *Id*. at ¶

70.

### 3.      Plaintiff Jason Kotoch

Plaintiff Jason Kotoch ("Kotoch") was on Biscayne Boulevard when the police line

started moving north.  *Id*. at ¶ 71.  Kotoch paused to help an unknown female after she was hit

with a projectile.  *Id*. at ¶¶ 71-72.  He was then hit with a projectile in the eyebrow.  *Id*. at ¶ 72.

"The force of the projectile knocked Kotoch to the ground and caused him to immediately bleed

profusely."  *Id*.  Plaintiffs allege that due to this injury, Mr. Kotoch sustained a skull fracture and

has never regained vision in his left eye.  *Id*. at ¶¶ 72, 73.

### 4.      Raymond Del Papa

Plaintiff Raymond Del Papa ("Del Papa") was also standing on Biscayne Boulevard after

the AFL-CIO march. *Id*. at ¶ 74.  The police line formed and began to move toward him.  *Id*. at ¶

75.  He looked for an avenue of escape, but the only direction he could move was to travel

northbound away from the line.  *Id*. at ¶¶ 75-76.  As he started to move northbound, he was shot

in the leg with a pepper ball. *Id*. at ¶ 76. Plaintiffs state that Del Papa previously suffered from a

supraventricular tachycardia heart condition ("SVT") and asthma.  *Id*. at ¶ 77. Due to the anxiety

caused by the police assault, Del Papa "began suffering breathing issues and increased heart

palpitations, potentially serious or even life threatening due to his asthma and SVT."  *Id*.

     **D.**     **First Amended Complaint**

Plaintiffs have now filed suit against Defendants in a twenty-seven count complaint.[5]  The

first twenty-five claims are plead as violations of 42 U.S.C. § 1983.  Plaintiffs allege violations

of their First Amendment, Fourth Amendment and Fourteenth Amendment rights.  In the last two

counts, Plaintiffs allege state law tort claims for battery and negligence.  Defendants have moved

to dismiss all the claims asserted against them.

## II.  Legal Standard

Defendants have moved to dismiss the First Amended Complaint for failure to state a

claim upon which relief may be granted pursuant to Rule 12(b)(6).   When reviewing a complaint

under Rule 12(b)(6), the court accepts all well-pleaded allegations as true and views the motion

in the light most favorable to the non-moving party. *Hishon v. King & Spalding*, 467 U.S. 69, 73

(1984).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the

claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 127 S.Ct.

---

[5]The operative complaint in this action is the First Amended Complaint.  Plaintiffs filed their First
Amended Complaint as a matter of right pursuant to Federal Rule of Civil Procedure 15 because at the time the
amended complaint was filed no responsive pleading had been filed.

1955, 1964 (2007) (quoting Fed. R. Civ. P. 8; *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Thus,

a plaintiff is not required to make detailed factual allegations; however, "a plaintiff's obligation

to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct.

at 1964-65. Factual allegations must be enough to raise a right to relief above the speculative

level . . .on the assumption that all the allegations in the complaint are true (even if doubtful in

fact)." *Id*. at 1965.

### III.  Analysis

Defendants have made numerous arguments in moving for the dismissal of Plaintiffs'

First Amended Complaint for failure to state a claim upon which relief can be granted.  The

Court addresses each argument pertaining to the dismissal of a particular type of claim without

regard to whether the argument was raised by a particular Defendant.  A number of identical

issues pertain to multiple Defendants, and Plaintiffs have been given sufficient opportunity to

address each argument.

### A.    *Monell* Liability

First, Defendants move to dismiss Counts One through Eight, which are section 1983

claims brought againt Defendants the City of Miami, the City of Miami Beach, the City of Fort

Lauderdale, and the BSO pursuant to *Monell v. Department of Social Services of City of New

York*, 436 U.S. 658 (1978). Defendants argue that Plaintiffs have not stated claims in these

counts because they have not sufficiently alleged the existence of an unconstitutional policy or

custom, that they have not sufficiently alleged that any policy or custom was a persistent or

widespread practice, that they have not sufficiently alleged that the policy or custom was

implemented by a final decision maker, and that they have not sufficiently alleged that there is

causal link between the municipal action and the deprivation of federal rights.  After careful

consideration, the Court finds Defendants have sufficiently alleged *Monell* claims against the

municipalities in Counts One through Eight.

  *Monell* provides that while a municipality may not be liable under theories of vicarious

liability or respondeat superior for constitutional violations under section 1983, a municipality

may be sued under section 1983 if "the action that is alleged to be unconstitutional implements or

executes a policy, statement, ordinance, regulation, or decision officially adopted and

promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  A plaintiff may demonstrate that

a municipality has such a policy by identifying "(1) an officially promulgated county policy or (2)

an unofficial custom or practice of the county shown through the repeated acts of a final

policymaker for the county."  *Grech v. Clayton County, Ga.*, 335 F. 3d 1326, 1330 (11th Cir.

2003).  "Custom consists of those practices of city officials that are 'so permanent and well

settled' as to have 'the force of law.'" *Gilmere v. City of Atlanta, Ga*., 737 F. 2d 854, 902 (11th

Cir. 1984) (quoting *Monell*, 436 U.S. at 691).  In addition, "the city custom which may serve as

the basis for liability may only be created by city 'lawmakers or those whose edicts or acts may

fairly be said to represent official policy.'" *Id.* (quoting *Monell*, 436 U.S. at 694). Finally, "[t]he

governmental custom or policy involved must be the 'moving force' behind the alleged

constitutional violation."  *Hamilton v. City of Jackson*, 508 F. Supp.2d 1045, 1056 (S.D. Ala.

2007).

  The Court finds in Counts One through Eight, Plaintiffs have sufficiently stated their

claims.  Plaintiffs have asserted *Monell* claims in Counts One through Five against Defendant the

City of Miami.  Count One alleges that the City of Miami adopted official policies to suppress protected speech and assembly in violation of the First Amendment.  Plaintiffs specifically cite the adoption of City Code Section 54-6.1 which criminalized certain mundane actions in the context of an assembly and allege that this ordinance, formally adopted by the Miami City Commission, was used "as a pretext . . .to justify assaults upon, and arrests of, peaceful demonstrators."  (D.E. No. 45 at ¶¶ 80, 81).  *See also supra* footnote 2 (discussing City Code Section 54-6.1).  Plaintiffs also allege that the City of Miami adopted Mutual Aid Agreements and a Joint Operational Security Plan, the unwritten purpose of which is alleged to have been "to severely limit opportunities for First Amendment-protected core political speech and assembly during the FTAA Ministerial Meetings."  *Id*. at ¶¶ 82-84.  Plaintiffs allege that the final decision makers adopted the policies "in a fashion which was a moving force behind the deprivation of Plaintiffs' constitutional rights" and "caused the deprivation of First Amendment rights of Plaintiffs and other persons during the FTAA Ministerial Meetings."  *Id*. at ¶ 84.

Count Two alleges the same claim against the City of Miami, but it is a claim for suppression of protected speech and assembly based on the actions of Defendant Timoney as the final policymaker and person responsible for implementation of agreements with other agencies.  *Id*. at ¶¶ 85-90.  Plaintiffs allege that Timoney's "tactics" were "the moving force behind the deprivation of their constitutional rights on November 20, 2003.  *Id*. at ¶ 90.

Count Three alleges that the City of Miami adopted official policies, which resulted in an unlawful seizure in violation of the Fourth Amendment.  This claim is also based on the adoption of the ordinance, the Mutual Aid Agreements, the Joint Operational Security Plan, and unwritten policies and adds the allegation that

> [a] key, albeit unwritten, purpose of the . . . . [Joint Operational Security Plan] was to severely limit" not only First Amendment speech and assembly but also to encourage "Fourth Amendment violations, specifically seizure though excessive force, including deadly force, by use of 'less lethal' weapons without any individualized probable cause, and the intentional use of physical force by law enforcement officers to restrain Plaintiffs' movement so as to seize them through herding techniques.

*Id*. ¶ 95.  Plaintiffs also allege that the adoption of these policies was "the moving force behind the deprivation of Plaintiffs' constitutional rights, . . . which proximately caused the deprivation of Fourth Amendment rights of Plaintiffs and other persons during the FTAA Ministerial Meetings." *Id*. at ¶ 96.

Count Four alleges that the City of Miami adopted official policies of excessive force in violation of the Fourth Amendment. This claim is also based on the Mutual Aid Agreements, the Joint Operational Security Plan, and unwritten policies.  It also adds the allegation that the excessive force used by the police was part of the Joint Operational Security Plan and that the adoption of the policies "caused the deprivation of Fourth Amendment rights of Plaintiffs and other persons during the FTAA Ministerial Meetings." *Id*. at ¶ 100.  Count Five alleges the same claim against the City of Miami regarding a policy for excessive force but is based on the actions of Defendant Timoney as a final policymaker.

In Counts Six, Seven, and Eight, Plaintiffs have alleged *Monell* claims against the City of Miami Beach, the City of Ft. Lauderdale and the BSO.  Count Six alleges that the City of Miami Beach, the City of Ft. Lauderdale, and the BSO adopted official policies to suppress protected speech and assembly in violation of the First Amendment.  This claim is similar to the claim in Count One against the City of Miami and again references the Mutual Aid Agreement, the Joint Operational Security Plan, and the unwritten policies already discussed above.  Plaintiffs allege

that the adoption of these policies "was the moving force behind the deprivation of Plaintiffs' constitutional rights, and proximately caused the deprivation of First Amendment rights of Plaintiffs and other demonstrators during the FTAA Ministerial Meetings." *Id*. at ¶ 111.

Count Seven alleges that the City of Miami Beach, the City of Ft. Lauderdale and the BSO, adopted official policies resulting in unlawful seizures in violation of the Fourth Amendment.  This claim is similar to the claim in Count Three against the City of Miami and is also based on the Mutual Aid Agreements, the Joint Operational Security plan, and the unwritten policies referenced above. Plaintiffs also allege that the adoption of these policies was the moving force behind their unlawful seizure Fourth Amendment violations.

Count Eight alleges that the City of Miami Beach, the City of Ft. Lauderdale and the BSO adopted official policies resulting in excessive force in violation of the Fourth Amendment. It is similar to the claim in Count Four asserted against the City of Miami and is again based on the Mutual Aid Agreements, the Joint Operational Security Plan, and the unwritten policies referenced above. These policies are also alleged to have been the moving force behind the excessive force Fourth Amendment violations.

The Court finds these allegations sufficiently state a claim against the municipalities for liability under section 1983.  First, the Court notes that there is no heightened pleading requirement when alleging a section 1983 claim against a municipality.  *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993).  Plaintiffs have sufficiently alleged a policy or widespread custom when they allege the adoption of the ordinance with respect to the City of Miami and when they allege the adoption of the Mutual Aid Agreements, the Joint Security Plan, and various unwritten policies, which were a part of the

mutual agreements with respect to all of the Municipal Defendants.

The Court also finds that Plaintiffs have sufficiently plead that a custom was adopted by a final policymaker where necessary.  Any arguments relating to whether or not someone is actually a final decision maker are more appropriately addressed on summary judgment.  The Court notes that Plaintiffs are entitled to plead in the alternative and they are not required to base their claims solely on official policies or solely on widespread customs.  *See* Fed. R. Civ. P. 8(d)(2).

The Court also finds that Plaintiffs have sufficiently alleged a causal link between the policies or customs and the constitutional violations.  The Court rejects Defendants' arguments that by stating that the "implementation" by officers and agencies of the policies "in a fashion" "which was the moving force" behind the constitutional violations, rather than just stating that the policies were the moving force behind the constitutional violations, transforms Plaintiffs' claims into an impermissible respondeat superior claim. Policies must be applied and implemented to have a causal link.  This allegation does not transform the claim into one of respondeat superior simply because it is employees who must apply or implement a policy. Thus, there are sufficient allegations against the Municipal Defendants to state *Monell* claims in Count One through Eight.[6]

**B.     Fourth Amendment Seizure**

Defendants also move to dismiss Counts Three, Four, Five, Seven, Eight, Ten, Eleven,

---

[6] The Court does not address Defendants' arguments relating to "failure to train" because Plaintiffs have not alleged a failure to train claims against the Municipal Defendants.  In addition, the City of Miami Beach initially argued that paragraph twenty-three in the First Amended Complaint incorporated additional non-specific claims against the Defendants, and that these claims should be dismissed.  Plaintiffs responded stating that they were not asserting separate causes of action in paragraph twenty-three.  Thus, the Court also does not address this argument.

Thirteen, Fifteen, Sixteen, Nineteen, Twenty, Twenty-Two, Twenty-Three, and Twenty-Five, which are section 1983 claims based on a violation of the Fourth Amendment.[7]  Specifically, these claims are predicated on a seizure.  The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  Defendants argue that these claims should be dismissed because the process of "herding" Plaintiffs is not a seizure.  After careful consideration, this Court finds Plaintiffs have sufficiently alleged an unlawful seizure in violation of the Fourth Amendment.

A seizure occurs "only when there is a governmental termination of freedom of movement through *means intentionally applied*."  *Brower v. County of Inyo*, 489 U.S. 593, 596-597 (1989).  *See also County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (reaffirming this principle).  The Court finds *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258 (D. Or. Sept. 8, 2003), *Coles v. City of Oakland*, No. C03-2962 THE (N.D. Cal. April 27, 2005), and *Rauen v. City of Miami*, No. CV 06-21182, 2007 WL 686609 (S.D. Fla. March 2, 2007) to be persuasive.  In these cases, the courts considered similar facts and found that a seizure did take place where police herded protestors resulting in an intentional governmental termination of freedom of movement.

In *Marbet*, the plaintiffs were members of a group of protestors protesting the policies of the Bush Administration outside the Hilton Hotel in downtown Portland, Oregon where President Bush attended a fund-raising event.  2003 WL 23540258, at *1.  Police officers used pepper

---

[7]Specifically, all of these counts allege violations of section 1983.  Counts Three, Four, Five, Seven, and Eight are *Monell* claims asserted against different Municipal Defendants.  Counts Ten, Eleven, Thirteen, Fifteen, Sixteen, Nineteen, Twenty, Twenty-Two, and Twenty-Three are supervisory liability claims asserted against specific individual Defendants.  Finally, Count Twenty-Five is a conspiracy to violate civil rights claim asserted against the Municipal Defendants.

spray on the crowd, fired rubber bullets at protestors, and forcibly moved the crowd. *Id*.

Plaintiffs filed suit against the City of Portland and individual officers asserting, among other

claims, Fourth Amendment violations. *Id*. at *9. Defendants filed a motion to dismiss arguing

that the Fourth Amendment did not apply because there was no seizure. *Id*. The *Marbet* Court

disagreed, finding that

> The Amended Complaint alleges facts, which, if proved, would establish that
> defendants intentionally restrained plaintiffs' freedom of movement. Plaintiffs
> allege that defendants intentionally applied pepper spray and shot rubber bullets at
> plaintiffs who were engaged in lawful protest activities. Further, the protesters
> were physically moved back from their peaceful positions, according to the
> Amended Complaint. In their supporting memorandum, defendants appear to
> contend that the Fourth Amendment is not offended by the intentional use of force
> that physically injures a citizen and only reduces his or her freedom of movement.
> If the citizen is able to walk or hobble away, according to defendants, no Fourth
> Amendment violation has occurred. However, as the Supreme Court has held,
> "the word 'seizure' readily bears the meaning of laying on of hands or application
> of physical force to restrain movement, even when it is ultimately unsuccessful."
> *California v. Hodari D*., 499 U.S. 621, 626 (1991).
>
> Defendants admit that on August 22, 2002, the police physically moved the
> protesters approximately 120 feet in order to create a larger entryway to the street.
> Defendants used pepper spray and physical force to achieve this movement.
> Clearly the effect of defendants' actions was to control plaintiffs' movement.
> Additionally, certain plaintiffs assert that they were physically prevented from
> leaving an area cordoned off by the police. By physically moving certain plaintiffs
> and circumscribing the area of movement of other plaintiffs, defendants seized
> plaintiffs within the meaning of the Fourth Amendment.

*Id*. at *10. Thus, the court found that a seizure had taken place and denied Defendants' motion to

dismiss finding that Plaintiffs had sufficiently asserted claims for Fourth Amendment violations.

In *Coles*, the plaintiffs were demonstrators, legal observers, videographers, journalists

and dockworkers who were protesting the Iraq war outside two companies that had economic

involvement in the war. No. 03-2962 at 2. The plaintiffs alleged that police officers fired

-16-

projectiles into the crowd, charged the plaintiffs with motorcycles, and hit the plaintiffs with clubs. *Id*. The plaintiffs also alleged that the police herded them from the port area to the West Oakland BART station, a distance of more than a mile. *Id*. Defendants filed a motion to dismiss the plaintiffs' Fourth Amendment claims, arguing that plaintiffs had not alleged a seizure. *Id*. at 4. The *Coles* court, relying in part on *Marbet*, found that plaintiffs had in fact been seized and noted that Defendants did more than just order the plaintiffs to disperse but "left Plaintiffs with only one available path by which to leave the scene and applied physical force to ensure that Plaintiffs followed that path." *Id*. at 10.

Finally in *Rauen*, the court considered a case which arose out of the same factual circumstances as this case where two plaintiffs were injured while demonstrating outside of the FTAA ministerial hearings on November 20, 2003. 2007 WL 686609, at *2-*3. In *Rauen*, the plaintiffs alleged that the police fired on protestors with rubber bullets, pepper-spray, and other weapons and then began marching shoulder-to-shoulder, herding the crowd and continuing to shoot projectiles. *Id*. Defendants filed a motion to dismiss the plaintiffs' Fourth Amendment claims, arguing that plaintiffs did not allege a seizure. *Id*. at *4. Relying in part on *Marbet* and *Coles*, the *Rauen* Court found that the plaintiffs had alleged a seizure. *Id*. at *7. The court noted that the complaint alleged "that Defendants employed a tactic of 'herding' in which they created a large 'encirclement perimeter' and used hundreds of heavily-armed, riot gear-clad officers in SWAT units and FTAA-specific 'filed forces' in a skirmish line to force demonstrators in a desired direction through the use of intensely excessive force." *Id*. Moreover "[i]n the process of herding the demonstrators, the officers used batons to beat them and sprayed pepper spray up and down the lines, while using bean bags, pepper spray balls, OC spray rounds, and tear gas." *Id*. at

*8.  The *Rauen* Court concluded that it could not be disputed that the complaint sufficiently

alleged "that Plaintiffs' freedom of movement was terminated by the deliberate use of force and

skirmish lines to herd and then encircle Plaintiffs in an area in which they otherwise would not

have been."  *Id*.  Thus, the court found the complaint sufficiently alleged a Fourth Amendment

violation.

 The Court finds that as in *Marbet*, *Coles*, and *Rauen*, Plaintiffs in this case have

sufficiently alleged that a seizure took place.  Plaintiffs allege that on the afternoon of November

20, 2003 they were peacefully observing, filming, or protesting when Defendants suddenly

"opened fire on the demonstrators with tear gas, pepper-spray, shotgun-based projectiles and

other weapons."  (D.E. No. 45, First Amended Complaint at ¶ 46).  The police officers then

began marching shoulder-to shoulder north on Biscayne Boulevard, continuing to fire projectiles

at the peaceful demonstrators and observers.  *Id*. at ¶¶ 47, 49.  The line eventually "pivoted and

began forcing the encircled demonstrators and others west on NE 3rd Street, where the assault

continued."  *Id*. at ¶ 49.  Plaintiffs further describe this "tactic of herding," stating that

Defendants created "a large 'encirclement perimeter'" and used "hundreds of heavily-armed, riot

gear clad . . . [law enforcement officers] in SWAT units and FTAA-specific 'field forces,'

aligned in a skirmish line to force the demonstrators in a desired direction through the use of

intensely excessive force."  *Id*. at ¶56.

 Accordingly, Plaintiffs have clearly alleged in their complaint that their was an

intentional government termination of their freedom of movement.  Thus, the Court finds as in

*Marbet*, *Coles*, and *Rauen* that Plaintiffs have sufficiently alleged a seizure, and the Court denies

Defendants' motion to dismiss Plaintiffs' Fourth Amendment claims.[8]

### C.      Fourteenth Amendment Claims

Next, Defendants move to dismiss Counts Twelve, Thirteen, and Seventeen, which are section 1983 claims pleaded as violations of the Fourteenth Amendment.  Count Thirteen is based on both a Fourth Amendment and Fourteenth Amendment violation.  Defendants argue that the claims based on violations of the Fourteenth Amendment are redundant as Plaintiffs have already alleged Fourth Amendment violations, and these are the appropriate vehicles to allege Plaintiffs' specific violations rather than a substantive due process claim.  This Court agrees and dismisses Counts Twelve, Thirteen, and Seventeen.

In Count Twelve, asserted against Defendants Timoney, Fernandez, and Cannon by Plaintiffs Keating, Kotoch, and Del Papa, Plaintiffs allege that Defendants violated their Fourteenth Amendment rights by ordering and approving the use of excessive force.  (D.E. No. 45, First Amended Complaint at ¶ 151).  In Count Thirteen, asserted against Defendants Timoney, Fernandez, and Cannon by Plaintiffs Keating, Kotoch, and Del Papa, Plaintiffs allege that Defendants as supervisors failed to train their officers prior to the FTAA ministerial

---

[8]Defendant Brooks also argues that if the Court determines "that the pleadings were sufficient to state a claim for an unlawful seizure under the Fourth Amendment, such a finding would necessitate dismissal of the excessive force claims as they must be subsumed by the seizure claim." (D.E. No. 72 at 9).  Defendant Brooks argues that the conduct which forms the basis of the seizure claim also forms the basis of the excessive force claim and thus, under this Circuit's law cannot survive as an independent claim. In making this argument, Brooks relies on *Bashir v. Rockdale County, Georgia*, 445 F. 3d 1323, 1331 (11th Cir. 2006).  *Bashir*, however, does not apply to this case and Defendant Brooks's argument is without merit.

In *Bashir*, the Court found that the plaintiff's excessive force claim was subsumed in his false arrest claim. *Id*. at 1332.  The Court stated that because Bashir's claim was "that the deputies used excessive force in the arrest because they lacked the right to make the arrest," it was not a discrete constitutional violation for excessive force. *Id*.  The Court concluded that "where an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim." *Id*.  The excessive force claims in this case are more than just that Defendants did not have the right to seize the Plaintiffs and thus any force used was excessive.  Plaintiffs have alleged excessive force claims independent of the allegations of unreasonable seizure.

meetings and "[a]s a result, excessive force was routinely used against Plaintiffs" and they "suffered injuries and a deprivation of their Fourth Amendment rights." *Id.* at ¶¶ 160, 161. Finally, in Count Seventeen, asserted against Defendants Yero, Brooks, and Spector by Plaintiffs Keating, Kotoch, and Del Papa, Plaintiffs allege that Defendants ordered and approved the "use of clearly excessive and deadly force" in violation of Plaintiffs' Fourteenth Amendment due process rights. *Id.* at ¶ 189. Thus, in Counts Twelve, Thirteen and Seventeen, Plaintiffs are essentially asserting Fourth Amendment violations based on excessive force.

It is clear that the Fourth Amendment and not the Fourteenth Amendment is the source of constitutional protection where a plaintiff is alleging excessive force in the context of an alleged seizure. The Supreme Court has stated:

> all claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Graham v. Connor*, 490 U.S. 386, 395 (1989). Accordingly, this Court grants Defendants' motions to dismiss the Fourteenth Amendment claims and dismisses Counts Twelve and Seventeen and the portion of Count Thirteen in which Plaintiffs assert a Fourteenth Amendment violation.

### D.    Conspiracy Claims

Defendants also move to dismiss Plaintiffs' claims in Counts Twenty-Four and Twenty-Five in which Plaintiffs allege a conspiracy to violate civil rights in violation of section 1983.

These counts are asserted against the City of Miami, the City of Miami Beach, the City of Ft. Lauderdale and the Broward County Sheriff's Office. These claims are premised upon violations of the First and Fourth Amendment. Defendants argue that Plaintiffs' allegations relating to these conspiracy claims are vague and conclusory.  Specifically, Defendants have argued that Plaintiffs have not included sufficient allegations that the Defendants reached an understanding with each other or another government entity and that Plaintiffs did not sufficiently allege any overt acts.[9] After careful consideration, this Court finds Plaintiffs have sufficiently alleged civil rights conspiracy claims in Counts Twenty-Four and Twenty-Five.

In order to state a claim for a conspiracy under section 1983, Plaintiffs must allege "1) an agreement between two or more state actors or a state actor and a private entity; 2) to act in concert to inflict an unconstitutional injury; and 3) an overt act done in furtherance of that goal, and causing some harm." *Craven v. Florida*, No. 6:08-CV-ORL-19, 2008 WL 2856830, at *5 (M.D. Fla. July 22, 2008) (quoting *Peres v. Oceanside Union Free Sch. Dist.*, 426 F. Supp.2d 15, 24 (E.D.N.Y.2006)) (internal quotation marks omitted).  In addition, "[a] plaintiff claiming a conspiracy under § 1983 must make particularized allegations that a conspiracy exists." *Hansel v. All Gone Towing, Inc.*, 142 Fed. Appx. 308, 309 (11th Cir. 2005). "Vague and conclusory allegations suggesting a § 1983 conspiracy are insufficient to withstand a motion to dismiss." *Id.*

In Count Twenty-Four, Plaintiffs allege that Defendants had an "unwritten agreement to suppress dissent at the FTAA through a show of overwhelming force, thereby violating the First

---

[9]At the hearing held on these motions, Defendants stated that they were making a new argument not raised in the motions that if Plaintiffs are alleging that the government agencies acted in concert then Plaintiffs cannot allege a conspiracy.  The Court has not considered this argument as it was never raised in the motions, and Plaintiffs have not had an opportunity to respond to it.  Defendants may raise any such argument in any motions for summary judgment they choose to file.

Amendment rights of speech, assembly, and association of Plaintiffs and other demonstrators."
(D.E. No. 45, First Amended Complaint at ¶241.).  Plaintiffs state that this agreement was
entered into in the course of the planning leading up to the FTAA which included the formation
of the Mutual Aid Agreements and the Joint Law Enforcement Command.  *Id.*  Plaintiffs also
allege that this agreement was implemented on November 20, 2003 "by the formation of police
lines that herded demonstrators and subjected demonstrators to a barrage of tear gas, pepper
spray, beanbags, and other projectiles thereby disrupting the lawful First Amendment speech,
assembly, and association."  *Id.* at 242.  Plaintiffs allege that this conspiracy was the "proximate
cause of the deprivation of Plaintiffs' First Amendment rights."  *Id.* at 243.  In Count Twenty-
Five, Plaintiffs make the same allegations with respect to the alleged violations of their Fourth
Amendment rights.

These allegations are sufficient to state a claim for a section 1983 conspiracy. Plaintiffs
clearly allege an agreement between two or more state actors to act in concert to inflict a
constitutional violation, namely First Amendment and Fourth Amendment violations.  In
addition, Plaintiffs allege overt acts in furtherance of this conspiracy, specifically the formation
of the police lines and the deployment of projectiles at the protestors allegedly in violation of
their constitutional rights. These allegations are neither vague nor conclusory, and the Court
denies Defendants' motions to dismiss Counts Twenty-Four and Twenty-Five.

### E.      Supervisory Liability Claims

Defendants next argue that Counts Nine through Twenty-Three, which are section 1983
claims premised upon the individual liability of supervising police officers should be dismissed.
Counts Nine through Twelve are supervisory liability claims asserted against Defendants

Timoney, Fernandez, and Cannon for directing unlawful acts in violation of the First, Fourth, and Fourteenth Amendment.[10]  Count Thirteen is asserted against Defendants Timoney, Fernandez, and Cannon for failure to train and is premised on violations of the Fourth and Fourteenth Amendment.[11]  Counts Fourteen through Seventeen are supervisory liability claims asserted against Defendants Yero, Brooks, and Spector for directing unlawful acts in violation of the First, Fourth and Fourteenth Amendments.  Counts Eighteen through Twenty are asserted against Defendants Timoney, Burden, Fernandez, and Cannon for their failure to stop unlawful acts and are premised on violations of the First and Fourth Amendments.  Counts Twenty-One through Twenty-Three are asserted against Defendants Yero, Brooks, and Spector and are also premised on violations of the First and Fourth Amendments.  Defendants have asserted a number of arguments with respect to the claims asserted against them in their individual capacity.  This Court has categorized these arguments as relating either to qualified immunity or the sufficiency of the pleadings.  The Court addresses each argument in turn, finding that Defendants' motions should be granted in part and denied in part with respect to these individual claims.

### 1.    Qualified Immunity

First, all of the individual Defendants have asserted that they are entitled to qualified immunity.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F. 3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In

---

[10]The Fourteenth Amendment claims have been dismissed.  *See supra* section III.C.

[11]*See supra* footnote 10.

order to receive qualified immunity, Defendants must first demonstrate that they were acting within their discretionary authority.  *Al-Amin v. Smith*, 511 F. 3d 1317, 1324 (11th Cir. 2008). Here, Plaintiffs have not disputed that all Defendants were acting within their discretionary authority.

Once Defendants establish that they were acting within their discretionary authority, the Court must first determine whether "the plaintiff's allegations, if true establish a constitutional violation."  *Id*.  "If a constitutional right would have been violated under plaintiff's version of the facts, the next question is whether the constitutional right was clearly established."  *Id*.  In evaluating whether the law was clearly established, "the salient question . . . is whether the state of the law . . . [at the time of the violation] gave respondents fair warning that their alleged treatment [of the Plaintiffs] was unconstitutional."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  In the Eleventh Circuit, "when case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state.  *Marsh v. Butler County*, 268 F. 3d 1014, 1032, n.10 (11th Cir. 2001) (en banc).

### a.    Fourth Amendment

Defendants have argued both that Plaintiffs have not alleged a Fourth Amendment constitutional violation because no seizure took place and that even if they have alleged a violation, such violation is not clearly established.  The Court has already found that Plaintiffs have alleged sufficient facts to find a seizure.  *See supra* section III.B.  After careful consideration, however, the Court finds that the Fourth Amendment violations were not clearly established.

In Counts Ten, Eleven, Thirteen, Fifteen, Sixteen, Nineteen, Twenty, Twenty-Two, Twenty-Three, Plaintiffs allege Fourth Amendment violations against the individual Defendants. Plaintiffs allege that specific individual Defendants ordered other police officers to "herd" protestors by forming lines and encircling them and by firing "less lethal" weapons at the protestors. Plaintiffs allege that these actions violated the Fourth Amendment because they resulted in an unreasonable seizure and because excessive force was used against Plaintiffs during the course of that seizure.

As stated above, the Court has found that Defendants' conduct resulted in a seizure. However, in finding that Defendants' conduct resulted in a seizure, the Court has found that there is a dearth of relevant case law addressing whether the conduct at issue in this case was in fact a seizure, that the broader clearly established principles of the Fourth Amendment do not give fair warning with respect to the conduct at issue in this case, and that the individual's alleged conduct did not so obviously violate the Constitution as to make the existence of prior law on point unnecessary. *See Mercado v. City of Orlando*, 407 F. 3d 1152, 1159 (11th Cir. 2005) (stating that a plaintiff may demonstrate that a law is clearly established in three ways: (1) by showing "that a materially similar case has already been decided," (2) by showing "that a broader, clearly established principle should control the novel facts in this situation," and (3) by showing "this case fits within the exception of conduct which so obviously violates that constitution that prior case law is unnecessary."). *See also Rauen*, 2007 WL 686609, at *19 (discussing the same factual circumstances and finding the law with regard to the Fourth Amendment violations was not clearly established). Both the claims for an unreasonable seizure and excessive force are dependent on this Court finding that there was a seizure. *See Troupe v. Sarasota County, Fla*.,

419 F.3d 1160, 1166 (11th Cir.2005) (stating that "[t]o assert a Fourth Amendment claim based

on the use of excessive force, the plaintiffs must allege (1) that a seizure occurred and (2) that the

force used to effect the seizure was unreasonable.").  Thus, the Court finds that the individual

Defendants are entitled to qualified immunity with respect to Counts Ten, Eleven, Thirteen,

Fifteen, Sixteen, Nineteen, Twenty, Twenty-Two, Twenty-Three, and these claims are dismissed.

### b.    First Amendment

Defendants have not disputed that Plaintiffs have alleged a First Amendment violation;

however, Defendants argue that this violation was not clearly established.  Defendants argue that

they are entitled to qualified immunity with respect to the First Amendment violations asserted

against them in their individual capacity as it is not clearly established that it is unconstitutional

"to use less-than-lethal weapons to disperse a crowd at a large public demonstration" nor is it

clearly established that it is unconstitutional "to give an order to other officers to use less-than-

lethal weapons to disperse a crowd at a large public demonstration."  (D.E. No. 71 at 9).

Defendants also argue just with respect to the claims asserted against them for failure to stop

unlawful acts that these claims are actually failure to intervene claims and that the law is not

clearly established that a failure to intervene claim exists with respect to the First Amendment.

After careful consideration, the Court finds Defendants are not entitled to qualified immunity on

the First Amendment claims.

In Counts Nine, Fourteen, Eighteen, and Twenty-One Plaintiffs allege First Amendment

claims against the individual Defendants.  First, Defendants argue that they are entitled to

qualified immunity on their First Amendment claims because it is not clearly established that it is

a First Amendment violation to either use or order other officers to use "less-lethal" weapons to

-26-

disperse a crowd at a large public protest.  In the context of the First Amendment, this Court does not see the significance of the use of "less-lethal" weapons nor does this Court find it significant that such weapons were used to disperse a large crowd.  As the *Rauen* Court stated in considering a similar case, the relevant allegation is "that Defendants infringed their First Amendment rights by forcing them to discontinue expressing themselves *via* peaceful protest.  The method by which Defendants allegedly did this is irrelevant."  2007 WL 686609, at *20.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I.  "It is well-established that peaceful protest is an expressive activity that constitutes protected 'speech' under the First Amendment." *Rauen*, 2007 WL 686609, at *19 (citing *United States v. Grace*, 461 U.S. 171, 176 (1983)).  Here, Plaintiffs have alleged that they were peacefully protesting or demonstrating when they were advanced upon by police lines and struck with projectiles fired by the police, which ended the peaceful protest  *See* (D.E. No. 45, First Amended Complaint at 1, 42-77).  These allegations are sufficient to state a First Amendment violation.  *See Rauen*, 2007 WL 686609, at *19.

Defendant Brooks also argues that because he was following the orders of superior officers, he is entitled to qualified immunity.  Officers following the orders of superior officers are entitled to qualified immunity unless they "acted unreasonably in following . . . [the superior officer's] lead, or that they knew or should have known that their conduct might result in a violation of the . . . [plaintiffs' federally protected] rights." *Hartsfield v. LeMacks*, 50 F. 3d 950, 956 (11th Cir. 1995).  The Court agrees with the conclusion in *Rauen* which considered similar facts and found that "[t]he individual Defendants . . . had no reason to believe that an order from

-27-

high-ranking Miami police officers to suppress legal protest on a wholesale basis with allegedly no justification would not result in violation of clearly established law." *Rauen*, 2007 WL 686609, at *21.

Defendants also argue that Counts Eighteen and Twenty-One asserted against specific individual Defendants for failure to stop unlawful acts are actually claims for failure to intervene, and there is no clearly established law that a failure to intervene claim may be based upon a First Amendment violation. This Court agrees that there is no relevant clearly established law demonstrating the requirement to intervene to prevent violations of the First Amendment.  This Court, however, does not agree that the claims in Counts Eighteen and Twenty-One are merely failure to intervene claims.  A failure to intervene claim arises where a police officer whether he is supervisory or not fails to intervene when a constitutional violation takes place in his or her presence.  *See Ensley v. Soper*, 142 F. 3d 1402, 1407 (11th Cir. 1998).  A supervisory liability claim is asserted against supervisors where they have personally participated in a constitutional violation or there is a causal connection between their actions and the violation.  See *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990).  One of the ways to demonstrate a causal connection is to show that a supervisor" knew that the subordinates would act unlawfully and failed to stop them from doing so." *Dalrymple v. Reno*, 334 F. 3d 991, 996 (11th Cir. 2003). This is what is alleged in Counts Eighteen and Twenty-One. Thus, the Court finds Defendants' arguments with regard to these counts are without merit.

### 2.      Sufficiency of Pleading

Defendants also make arguments with regard to the sufficiency of the supervisory claims asserted against them.  The Court addresses these arguments in light of the four remaining

supervisory liability claims in Counts Nine, Fourteen, Eighteen, and Twenty-One and finds these claims are sufficiently pleaded.

### a.        Specific Allegations Against Each Individual Officer

First, Defendants argue that with regard to the claims asserted against the individual officers for supervisor liability that there are insufficient allegations to put them on notice as to what conduct is the basis for the alleged violations. The Court finds in considering the remaining claims against the individual Defendants that Plaintiffs have made sufficient allegations against each individual Defendant for supervisory liability under section 1983.

It is well established in this Circuit that claims under section 1983 against individuals who may assert qualified immunity as a defense are subject to a heightened pleading standard. *Danley v. Allen*, 540 F. 3d 1298, 1313-14 (11th Cir. 2008).  "It is [also] well established . . . that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.'" *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.1999) (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir.1994)).  In a section 1983 action, "[s]upervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown ,* 906 F.2d at 671.  The Eleventh Circuit has stated that

> A causal connection can be established when a history of widespread abuse puts
> the responsible supervisor on notice of the need to correct the alleged deprivation,
> and he fails to do, or when the supervisor's improper custom or policy . . .resulted
> in deliberate indifference to constitutional rights.  A causal connection can also be
> established by facts which support an inference that the supervisor directed the
> subordinates to act unlawfully or knew that the subordinates would act unlawfully
> and failed to stop them from doing so.

*Dalrymple*, 334 F. 3d at 995-96 (internal quotation marks and citations omitted).  Here, Plaintiffs

have alleged in Counts Nine and Fourteen that specific supervisory Defendants directed their

subordinates to act unlawfully and in Counts Eighteen and Twenty-One that specific supervisory

Defendants knew that they would act unlawfully and failed to stop them.

### i.      Timoney

Plaintiffs allege that Defendant Timoney was "an official decision maker regarding the

City of Miami's FTAA law enforcement operation."  (D.E. No. 45, First Amended Complaint at

¶¶ 122, 193).  Plaintiffs allege that on November 20, 2003, Timoney, who is also Chief of the

Miami Police Department, "approved orders issued by Assistant Chief Fernandez and Captain

Cannon, thereby permitting the police line to continue marching northward while beating

unarmed demonstrators and discharging hundreds of projectiles and tear gas."  *Id.* at ¶126.

Plaintiffs allege that Timoney's approval of Defendant Fernandez and Defendant Cannon's

orders was the proximate cause of the deprivation of Plaintiffs' rights.  *Id.* at ¶ 127.

Plaintiffs also allege that on November 20, 2003, "at the precise time in the afternoon that

Plaintiffs were assaulted by the police line" Timoney was "less than 100 feet from the rear of the

police skirmish line, with an unrestricted view of the herding of demonstrators and the discharge

of tear gas, bean bags[,] . . . pepper spray, and other projectiles." *Id.* at ¶ 125.  *See also id.* at ¶¶

196, 197. Plaintiffs allege that Timoney, knowing that his subordinates "would continue to act

unlawfully in their deliberate abrogation" of Plaintiffs' rights, "failed to stop" his subordinates

and allowed "the police line to continue marching northward while discharging hundreds of

projectiles and tear gas and beating unarmed demonstrators."  *Id.* at ¶ 198. Plaintiffs allege that

Timoney's failure to stop his subordinates from acting unlawfully was also the proximate cause

of Plaintiffs' deprivation of rights.  *Id.* at ¶ 199.  These allegations  in Counts Nine and Eighteen, even under the heightened pleading standard, are sufficiently specific and state a claim against Timoney for supervisory liability on the basis of directing unlawful acts and for failure to stop unlawful acts.

### ii.      Fernandez

Plaintiffs allege that Defendant Fernandez, Deputy Chief of the Miami Police Department, was also "an official decision maker in his role as Incident Commander."  *Id.* at ¶¶ 123, 194.  Plaintiffs allege that Fernandez "made the decision to utilize 'herding techniques' to corral demonstrators during the afternoon of November 20, 2003, by personally directing the police lines to march northward and disrupt the lawful assembly . . . which decision deprived Plaintiffs of their . . . rights."  *Id.* at ¶ 123.  See also *id.* at ¶ 194.

Plaintiffs also allege that "[a]t the precise time on November 20, 2003 that Plaintiffs were assaulted by the police line" Fernandez was "just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and of the discharge of tear gas, pepper spray, bean bags, and other projectiles."  *Id.* at ¶¶ 124, 197.  Plaintiffs also allege that Fernandez knew that his subordinates "would continue to act unlawfully in their deliberate abrogation" of Plaintiffs' rights and "failed to stop" his subordinates and allowed "the police line to continue marching northward while discharging hundreds of projectiles and tear gas and beating unarmed demonstrators."  *Id.* at ¶ 198.  Plaintiffs allege that Fernandez's failure to stop his subordinates from acting unlawfully was also the proximate cause of Plaintiffs' deprivation of rights.  *Id.* at ¶ 199.  These allegations  in Counts Nine and Eighteen, even under the heightened pleading standard, are sufficiently specific and state a claim against Fernandez for supervisory liability on

the basis of directing unlawful acts and for failure to stop unlawful acts.

### iii.   Cannon

Next, Plaintiffs allege that Defendant Cannon, a captain in the Miami Police Department, "was an official decision maker and directed the police lines, which had been ordered to march northward by Fernandez, to begin discharging weapons at the unarmed demonstrators, which decision deprived Plaintiffs of their constitutional rights." *Id.* at ¶ 195. *See also id.* at ¶ 124. Plaintiffs also allege that at the time Plaintiffs were assaulted, Cannon like Fernandez was situated "just to the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and of the discharge of tear gas, pepper spray, bean bags, and other projectiles." *Id.* at ¶¶124, 197.  Plaintiffs also allege that Cannon knew that his subordinates "would continue to act unlawfully in their deliberate abrogation" of Plaintiffs' rights and "failed to stop" his subordinates and allowed "the police line to continue marching northward while discharging hundreds of projectiles and tear gas and beating unarmed demonstrators." *Id.* at ¶ 198.  Plaintiffs allege that Burden's failure to stop his subordinates from acting unlawfully was also the proximate cause of Plaintiffs' deprivation of rights. *Id.* at ¶ 199.  These allegations  in Counts Nine and Eighteen, even under the heightened pleading standard, are sufficiently specific and state a claim against Burden for supervisory liability on the basis of directing unlawful acts and for failure to stop unlawful acts.

### iv.   Burden

Plaintiffs allege that Defendant Burden, a major in the Miami Police Department, was with Timoney at the time when Plaintiffs were assaulted, standing "less than 100 feet from the rear of the police skirmish line, with an unrestricted view of the herding of demonstrators and the

discharge of tear gas, bean bags, and pepper spray." *Id*. at ¶¶ 196, 197. Plaintiffs also allege that

Burden knew that his subordinates "would continue to act unlawfully in their deliberate

abrogation" of Plaintiffs' rights and "failed to stop" his subordinates, allowing "the police line to

continue marching northward while discharging hundreds of projectiles and tear gas and beating

unarmed demonstrators." *Id*. at ¶ 198.  Plaintiffs allege that Cannon's failure to stop his

subordinates from acting unlawfully was also the proximate cause of Plaintiffs' deprivation of

rights. *Id*. at ¶ 199.  These allegations  in Count Eighteen, even under the heightened pleading

standard, are sufficiently specific and state a claim against Cannon for supervisory liability on the

basis of failure to stop unlawful acts.

**v.      Yero**

Plaintiffs allege that Defendant Yero, a lieutenant in the City of Miami Beach's Police

Department, "was an official decision maker for the City of Miami Beach PD's forces provided

for the FTAA pursuant to the mutual aid agreement and other agreements, with respect to the

decision to discharge shotgun-based projectiles, pepper spray and tear gas." *Id*. at ¶ 163.  *See*

*also id.* at ¶ 220.  Plaintiffs also allege that "Yero gave the order to shoot and spray unarmed

demonstrators near Biscayne Boulevard at approximately 3:30 p.m. on November 20, 2003."  *Id*.

Plaintiffs allege that this command order proximately caused their constitutional violations.  *Id*.

at ¶ 167.

At the time Plaintiffs were assaulted by police, Plaintiffs allege that Yero was "directly

behind the police skirmish line that was marching northward to herd demonstrators, and directed

. . . [his] platoon to follow the orders of Fernandez and Cannon to march northward and

discharge weapons at the unarmed demonstrators, including the Plaintiffs."  *Id*. at ¶¶ 166, 223.

Plaintiffs allege that Yero "failed to stop" his subordinates despite "personally viewing the severe injuries caused by the police line" as it continued to march forward discharging projectiles. *Id*. at ¶ 223. Plaintiffs allege that Yero had "ample time and full opportunity to stop" his subordinates from carrying out the unlawful acts which were the proximate cause of Plaintiffs' deprivations. *Id*. at ¶ 224. These allegations in Counts Fourteen and Twenty-One, even under the heightened pleading standard, are sufficiently specific and state a claim against Yero for supervisory liability on the basis of directing unlawful acts and failure to stop unlawful acts.

### vi.    Brooks

Plaintiffs allege that Defendant Brooks was "an official decision maker as the commander of the BSO field force provided for the FTAA pursuant to the mutual aid agreement and other agreements, responsible for the movement of . . . [law enforcement officers] under his command and the discharge of weapons." *Id*. at ¶ 164. Plaintiffs allege that this command order was a proximate cause of their constitutional deprivations. *Id*. at ¶ 167.

At the time Plaintiffs were assaulted by police, Plaintiffs allege that Brooks was "directly behind the police skirmish line that was marching northward to herd demonstrators, and directed . . . [his] platoon to follow the orders of Fernandez and Cannon to march northward and discharge weapons at the unarmed demonstrators, including the Plaintiffs." *Id*. at ¶¶ 166, 223. Plaintiffs allege that Brooks "failed to stop" his subordinates despite "personally viewing the severe injuries caused by the police line" as it continued to march forward discharging projectiles. *Id*. at ¶ 223. Plaintiffs allege that Brooks had "ample time and full opportunity to stop" his subordinates from carrying out the unlawful acts which were the proximate cause of Plaintiffs' deprivations. *Id*. at ¶ 224. These allegations in Counts Fourteen and Twenty-One,

-34-

even under the heightened pleading standard, are sufficiently specific and state a claim against Brooks for supervisory liability on the basis of directing unlawful acts and failure to stop unlawful acts.

### vii.    Spector

Finally, Plaintiffs allege that Defendant Spector "was an official decision maker as the commander of a 45-member Fort Lauderdale PD platoon, referred to as the BRAVO field force, which was provided for the FTAA on November 20, 2003, pursuant to the mutual aid agreement and other agreements, responsible for the movement of . . . [law enforcement officers] under his command and the discharge of weapons." *Id*. at ¶ 165. Plaintiffs allege that Spector's command orders were a proximate cause of their constitutional deprivations. *Id*. at ¶ 167.

At the time Plaintiffs were assaulted by police, Plaintiffs allege that Spector was "directly behind the police skirmish line that was marching northward to herd demonstrators, and directed . . . [his] platoon to follow the orders of Fernandez and Cannon to march northward and discharge weapons at the unarmed demonstrators, including the Plaintiffs." *Id*. at ¶¶ 166, 223. Plaintiffs allege that Spector "failed to stop" his subordinates despite "personally viewing the severe injuries caused by the police line" as it continued to march forward, discharging projectiles. *Id*. at ¶ 223. Plaintiffs allege that Spector had "ample time and full opportunity to stop" his subordinates from carrying out the unlawful acts which were the proximate cause of Plaintiffs' deprivations. *Id*. at ¶ 224. These allegations in Counts Fourteen and Twenty-One, even under the heightened pleading standard, are sufficiently specific and state a claim against Spector for supervisory liability on the basis of directing unlawful acts and failure to stop unlawful acts.

        **b.**     **Defendant Yero's Argument that Supervisory Liability Claims are Duplicative**

Defendant Yero also argues that the supervisory counts asserted against him should be dismissed because they are duplicative of the section 1983 asserted against the City of Miami Beach in Counts Six, Seven, and Eight. However, the supervisory liability claims asserted against Yero in Counts are asserted against him in his individual capacity. Thus, the Court finds this argument without merit.

     **F.**     **State Law Claims**

Finally, Defendants also move to dismiss Plaintiffs' state law claims for battery and negligence asserted in Counts Twenty-Six and Twenty-Seven.

     **1.**     **Battery**

The battery claim in Count Twenty-Six is asserted against Defendants the City of Miami, the City of Miami Beach, the City of Ft. Lauderdale, and the BSO. Defendant the BSO moves to dismiss this claim, arguing that Plaintiffs have not sufficiently plead an battery as they have only alleged an unintended injury and arguing that either the municipality or an employee of the municipality may be found liable for tortious conduct under section 768.28 of the Florida statutes but not both. The City of Miami and the City of Miami Beach have also argued that the battery claim should be dismissed because pursuant to section 768.28, a governmental agency does not have vicarious liability for the acts of the employees of another governmental agency. After careful consideration, the Court denies Defendants' motions to dismiss this count.

First, the BSO argues that Plaintiffs have not sufficiently pleaded a battery because they have not sufficiently alleged that Defendants took affirmative actions with the intention of

causing the contacts that resulted.  "In order to state a cause of action for battery under Florida

law, the plaintiff must allege that the tortfeasor made some form of harmful or offensive contact,

and that he or she intended to cause the contact."  *Vernon v. Medical Mgmt. Ass'n of Margate,*

*Inc.*, 912 F. Supp. 1549, 1556 (S.D. Fla. 1996).  In addition, the doctrine of respondeat superior

applies to this tort claim.  This doctrine provides that an employer may be held vicariously liable

for the acts of an employee where a plaintiff establishes that the acts were committed in the

course and scope of the employee's employment and that the act was done in furtherance of the

employer. *Bryant v. CSX Transp., Inc.*, 577 So. 2d 613, 615 (Fla. 1st DCA 1991).  Here, there are

sufficient allegations in the First Amended Complaint that the BSO is vicariously liable for the

intentional, harmful contacts of their employees.  *See* (D.E. No. 45, First Amended Complaint at

¶¶ 251-253).

The BSO also argues that the claim asserted in Count Twenty-Six for battery is based on

the same conduct alleged to give rise to the civil rights claims asserted against the individual

Defendants.  The BSO argues that pursuant to section 768.28(9)(a) of the Florida Statutes the

municipalities cannot be held liable for the bad faith actions of individual officers and that "it

seems to belie reason to enable a plaintiff to argue on the one hand that conduct was egregious

enough to constitute a knowing violation of clearly established rights, while on the other hand

maintaining the same conduct should expose the agency to liability in the face of F.S.

768.28(9)(a)."  (D.E. No. 72 at 17).  This Court disagrees.

Section 768.28(9)(a) in relevant part provides:

> The state or its subdivisions shall not be liable in tort for the acts or omissions of
> an officer, employee, or agent committed while acting outside the course and
> scope of her or his employment or committed in bad faith or with malicious

purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

In the civil rights claims, Plaintiffs have not specifically stated that the individual Defendant officers were acting "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights." As the *Rauen* Court stated "[i]t is possible for a law enforcement officer to commit an illegal act in the course of his or her employment while acting in good faith." *Rauen*, 2007 WL 686609, at *14. The Court does find that the conduct alleged in this case could be viewed as rising to the level of wanton and willful conduct; however, Plaintiffs are entitled to plead in the alternative, and this claim is not precluded. *See* Fed. R. Civ. P. 8(d)(2). Therefore, Defendants are not entitled to a dismissal of Count Twenty-Six based on this argument.

Finally, the City of Miami and the City of Miami Beach argue that the battery claim in Count Twenty-Six should be dismissed because section 768.28(9)(a) precludes an agency from being held vicariously liable for the actions of another agency's employees. Defendants argue that because this statute which includes a partial waiver of sovereign immunity must be strictly construed against any waiver, the exclusive remedy for each employee's actions is a suit against the particular agency employing the officer. Plaintiffs respond that on the day of the FTAA ministerial meetings, all officers were acting as agents of each of the law enforcement agencies involved in the Joint Operational Security Plan. *See* (D.E. No. 79 at 16-17). Thus, in reality a suit against another agency in this situation is a suit against the governmental entity for which the particular Defendant was acting as an agent-employee.

The Court finds this is essentially a question of statutory construction with regard to

section 768.28(9)(a).  Thus, the Court begins by examining the plain language of the statute. *See*

*Rendon v. Valley Crest Prods., Ltd*., 294 F. 3d 1279, 1284 n.6 (11th Cir. 2002) (stating that "[a]s

in all disputes involving issues of statutory construction, we begin with the plain language of the

statute.").  This section of the statute states in its entirety that

> (9)(a) No officer, employee, or agent of the state or of any of its subdivisions shall
> be held personally liable in tort or named as a party defendant in any action for
> any injury or damage suffered as a result of any act, event, or omission of action in
> the scope of her or his employment or function, unless such officer, employee, or
> agent acted in bad faith or with malicious purpose or in a manner exhibiting
> wanton and willful disregard of human rights, safety, or property. However, such
> officer, employee, or agent shall be considered an adverse witness in a tort action
> for any injury or damage suffered as a result of any act, event, or omission of
> action in the scope of her or his employment or function. The exclusive remedy
> for injury or damage suffered as a result of an act, event, or omission of an officer,
> employee, or agent of the state or any of its subdivisions or constitutional officers
> shall be by action against the governmental entity, or the head of such entity in her
> or his official capacity, or the constitutional officer of which the officer,
> employee, or agent is an employee, unless such act or omission was committed in
> bad faith or with malicious purpose or in a manner exhibiting wanton and willful
> disregard of human rights, safety, or property. The state or its subdivisions shall
> not be liable in tort for the acts or omissions of an officer, employee, or agent
> committed while acting outside the course and scope of her or his employment or
> committed in bad faith or with malicious purpose or in a manner exhibiting
> wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 968.28(9)(a).

The Court finds in examining the plain language of this section that it specifically

provides for a government agency to be held liable on the basis of an agent's actions.  The statute

provides that the "exclusive remedy" for injury or damage suffered because of an action taken by

an "officer, employee, or agent of the state or any of its subdivisions" is a suit against the

governmental entity "of which the officer, employee, or agent is an employee."  Employee is

defined as "[a] person who works in the service of another person (the employer) under an

express or implied contract for hire, under which the employer has the right to control the details

of work performance."  BLACK'S LAW DICTIONARY 564 (8th ed. 2004).

Thus, the plain language of the statute, even if such language is strictly construed,

provides that where a person is acting as an agent/employee for a governmental entity, such

governmental entity may be held liable for their actions. Under the plain reading of this statute, if

an individual were acting as an officer or an agent of more than one governmental entity all

governmental entities for which he or she was employed could be held liable.  The Court notes,

however, that whether a particular officer was an agent of a particular municipality is a fact-

intensive question which cannot be resolved on a motion to dismiss.  Thus, the Court denies

Defendants' motions to dismiss Count Twenty-Six.

### 2.    Negligence

The negligence claim in Count Twenty-Seven is asserted against Defendants Timoney,

Fernandez, Cannon, Burden, Yero, Spector, and Brooks. Defendants move to dismiss Plaintiffs'

state law claim for negligence, arguing that Plaintiffs have failed to establish an underlying

common law or statutory duty, that the individual officers cannot be personally liable for

negligence under section 768.28, that this claim is precluded as there is no such claim as a claim

for negligent excessive force, and that there is no such claim as a claim for negligent arrest.

First, Defendants argue that Plaintiffs cannot assert a claim for negligence because they

have not alleged that a duty of care existed between Plaintiffs and the police officers.  Police

officers generally do not have a duty of care to individuals. *Everton v. Willard*, 468 So.2d 936,

938 (Fla.1985).  However, a special duty of care arises "when law enforcement officers become

directly involved in circumstances which place people within a 'zone of risk' by creating or

permitting dangers to exist, by taking persons into police custody, detaining them, or otherwise subjecting them to danger." *Pollock v. Fla. Dep't of Highway Patrol*, 882 So.2d 928, 935 (Fla. 2004).

Here, the Court finds that Plaintiffs have made sufficient allegations that a special duty of care existed.  Plaintiffs allege that at approximately 3:30 p.m. on November 20, 2003 police officers formed police lines and "herded demonstrators and discharged chemical weapons and projectiles at demonstrators."  (D.E. No. 45, First Amended Complaint at ¶ 255).  Plaintiffs also allege that "[t]hrough the use of less-lethal weapons that were not designed for general crowd control purposes, and by utilizing those weapons against the large . . . [crowd] gathered near Biscayne Boulevard and the grass lawn, which crowd included the Plaintiffs, Defendants Timoney, Fernandez, Cannon, Burden, Yero, Spector and Brooks created a foreseeable zone of risk."  *Id*. at ¶ 256. *See also Rauen*, 2007 WL 686609, at *16. (finding that where the plaintiffs alleged that police officers formed a skirmish line and herded "demonstrators engaged in constitutionally-protected expressive activity [this] created a zone of risk to the demonstrators, including Plaintiffs, and to other people present in the area.").  Thus, the Court finds Plaintiffs have sufficiently alleged that the individual officers were directly involved in placing Plaintiffs in a zone of risk by creating a dangerous situation and permitting this dangerous situation to continue.

Next, the individual Defendants argue that Plaintiffs cannot assert a claim for negligence against them because they cannot be held personally liable pursuant to section 768.28(9)(a) for negligence.  As stated above, pursuant to section 768.28(9)(a), an officer cannot be held personally liable for a tort unless he or she "acted in bad faith or with malicious purpose or in a

manner exhibiting wanton and willful disregard of human rights, safety, or property." While the Court agrees that Defendants cannot be found liable for simple negligence, Plaintiffs have alleged facts that demonstrate that Defendant officers had a "wanton and willful disregard of human rights, safety, or property."

"Willful and wanton conduct is generally something more than ordinary negligence but less than deliberate conduct." *Lemay v. Kondrk*, 860 So. 2d 1022, 1025 (Fla. 5th DCA 2003). In order to demonstrate willful and wanton conduct, "it must be shown that the defendant knew, or reasonably should have known in light of the surrounding circumstances, that his conduct would naturally or probably result in injury and, with such knowledge, disregarded the foreseeable injurious consequences." *Id.* In this case where Plaintiffs allege that Defendants discharged weapons into an unarmed crowd "that the Defendants knew had a high probability of causing considerable harm," the Court finds Plaintiffs have sufficiently pleaded their claim. *See* (D.E. No. 45, First Amended Complaint at ¶ 257).

Finally, Defendants argue that Plaintiffs have failed to state a claim in Count Twenty-Seven because there is no such claim for negligent use of excessive force nor is there a claim for negligent arrest. The Court finds, however, that Plaintiffs are not alleging a negligent use of excessive force or a negligent arrest claim. The Court notes with regard to the negligent arrest claim that there are no allegations in the First Amended Complaint that any of the Plaintiffs were arrested. Thus, the Court declines to dismiss Count Twenty-Seven.

### IV.  Conclusion

Based on the foregoing it is **ORDERED AND ADJUDGED** as follows:

1.      City of Miami's & Miami Police Supervisors' Motion to Dismiss Amended

Complaint (D.E. No. 68) is **GRANTED in part** and **DENIED in part**.

2. Defendants Lee Spector and City of Fort Lauderdale's Motion to Dismiss Counts Six, Seven, Eight, Fourteen, Fifteen, Sixteen, Seventeen, Twenty-One, Twenty-Two, Twenty-Three, and Twenty-Seven of Plaintiffs' First Amended Complaint (D.E. No. 69) is **GRANTED in part** and **DENIED in part**.

3. The City of Miami Beach's Motion to Dismiss Counts Six, Seven, Eight, Twenty-Four, Twenty-Five, and Twenty-Sex of Plaintiffs' First Amended Complaint (D.E. No. 70) is **GRANTED in part** and **DENIED in part**.

4. Defendant Ed Yero's Motion to Dismiss the Amended Complaint (D.E. No. 71) is **GRANTED in part** and **DENIED in part**.

5. Defendants Broward Sheriff Alfred Lamberti and John Brooks' Motion to Dismiss the First Amended Complaint (D.E. No. 72) is **GRANTED in part** and **DENIED in part**.

6. Counts Ten, Eleven, Twelve, Thirteen, Fifteen, Sixteen, Seventeen, Nineteen, Twenty, Twenty-Two, and Twenty-Three are **DISMISSED** against all Defendants.

7. **On or before February 4, 2009**, Defendants shall file Answers to the remaining claims in the First Amended Complaint.

DONE AND ORDERED in Chambers at Miami, Florida, this 20 day of January, 2009.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Brown
All Counsel of Record

-43-